HODGSON LEGAL
CHERYL L. HODGSON (CSB# 141275)
cheryl@hodgsonlegal.com
100 Wilshire Blvd., Suite 950
Santa Monica, CA 90401
Telephone: (310) 623-3515

EVAN S. COHEN (CSB# 119601)
esc@manifesto.com
1180 South Beverly Drive, Suite 510
Los Angeles, CA 90035
Telephone: (310) 556-9800

BRIDGET B. HIRSCH (CSB# 257015)
bridget@bbhirsch.com
7435 North Figueroa Street, No. 412422
Los Angeles, CA 90041
Telephone: (323) 387-3413

Attorneys for Plaintiffs
SST RECORDS, INC. and GREGORY R. GINN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SST RECORDS, INC., a Texas corporation; GREGORY R. GINN, an individual,

Plaintiffs

vs.

HENRY GARFIELD a/k/a HENRY ROLLINS, an individual; KEITH MORRIS, an individual; GARY MCDANIEL a/k/a CHUCK DUKOWSKI, an individual; DENNIS PAUL CADENA a/k/a DEZ CADENA, an individual; JOHN WILLIAM STEVENSON a/k/a BILL STEVENSON, an individual; and STEPHEN PATRICK O'REILLY a/k/a STEPHEN EGERTON, an individual, and DOES 1 through 10, inclusive,

Defendants.

CASE NO. CV 13-05579 DDP (MANx)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Date: October 7, 2013
Time: 10:00 am
Ctrm: 3 – 2nd Floor

Judge: Honorable Dean D. Pregerson

# Table of Contents

I. INTRODUCTION ....................5
II. STATEMENT OF FACTS ....................6
III. PROCEDURAL HISTORY....................9
IV. ARGUMENT ....................9
A. Preliminary Injunction Standards....................9
B. Plaintiffs Are the Undisputed Owners of the BLACK FLAG Marks....................10
C. Plaintiffs Are Likely To Succeed On The Merits ....................12
1. Plaintiff is Entitled to Cancellation of Morris/Garfield Registration Based upon Fraud on the Trademark Office. ....................12
2. Plaintiffs Can Show Willful Infringement and Likelihood of Confusion ....................13
a. Plaintiffs Have Valid and Protectable Rights In BLACK FLAG and the BLACK FLAG Logo....................14
b. Defendants are Using Plaintiffs' Marks to Promote their FLAG Shows and Have Laid Fraudulent Claim to Ownership of the Marks. ....................15
c. The Goods and Service Are More than Related, They are Identical....................16
d. There Is Strong Evidence Of Likely Confusion ....................16
e. The Parties' Marketing Channels are Identical ....................17
f. Defendants Intend to Confuse Consumers....................17
g. Likelihood of Expansion of Product Lines ....................18
D. Absent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm....................18
1. Loss of Control of One's Business Reputation is Irreparable Harm. ....................18
2. Defendants' former assoication with BLACK FLAG is their only calling card to sell tickets to the public. ....................19
E. The Balance of Equities Weighs Decidedly In Plaintiffs' Favor ....................20
F. An Interim Injunction Would Serve The Public Interest....................21
G. The Injunction Sought Will Not constitute an Undue Hardship to Defendants ....................21
H. SST and Ginn are Prepared to Post a Bond ....................22
V. CONCLUSION ....................23

**CASES**

*AmBrit, Inc. v. Kraft, Inc.*, 805 F.2d 974, 1 U.S.P.Q.2d 1161 (11th Cir. 1986), op. superseded by 812 F.2d 1531 (11th Cir. 1986), cert. denied, 481 U.S. 1041, 95 L. Ed. 2d 822, 107 S. Ct. 1983 (1987)………………………. ........................17

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)............. 13, 16, 20

*Applied Info. Sciences Corp. v. eBay, Inc.*, 551 F.3d 966, 969 (9th Cir. 2007) ..........................................................................................................13

*Aurora World v. Ty, Inc.*, 719 F. Supp.2d 1115, 1156 (C.D. Cal. 2009) .......................14

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006);.............................................................................................18

*Brookfield Communications v. West Coast Entertainment Corp.*, 174 F.3d 1036, 50 U.S.P.Q. 1545 (9th Cir.1999).................................................. 14, 16, 18

*Cytosport, Inc. v. Vital Pharms., Inc.*, 617 F.Supp.2d 1051, 1080 (E.D. Cal. 2009)……………………………………………………………………………….19

*Diller v. Barry Driller, Inc.*, 2012 U.S. Dist. LEXIS 133515, at *25-26 (C.D. Cal. Sept 10, 2012)........................................................................................19

*El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032, 1038 (9th Cir.2003)……………………10

*Entrepreneur Media v. Smith*, 279 F.3d 1135, 1149 (9th Cir. 2002)............................18

*Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963), *cert. denied*, 374 U.S. 830, 10 L. Ed. 2d 1053, 83 S. Ct. 1870 (1963)………………...17

*Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)…....................10

*Foxtrap, Inc. v. Foxtrap, Inc.* 671 F.2d 636, 215 U.S.P.Q. 1105 (D.C. Cir. 1982) …9-10

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000)……….10, 15

*HEC Enters, Ltd. v. Deep Purple, Inc.,* 213 U.S.P.Q. 991 (C.D. Cal.1980)…………….11

*Kingsmen v. K-Tel International, Ltd.,* 557 F. Supp. 178 (S.D.N.Y. 1983). .................11

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877, 91 U.S.P.Q.2d 1245 (9th Cir. 2009)……………………..........................................................10

*Maxim Integrated Prods. V. Quintana*, 654 F. Supp. 2d 1024 (N.D. Cal. 2009). ...........................................................................................................19

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 596 (3d Cir. 2002) ..........................................................22

*Ocean Garden, Inc. v. Marktrade Co.*, 953 F. 2d 500, 506 (9th Cir. 1991) ..................14

*Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 197,17 U.S.P.Q.2d 1117 (3d Cir. 1990)……………………………………………….21

*Pac. Telesis v. Int'l Telesis Comms.* , 994 F.2d 1364, 1369 (9th Cir. 1993) .................18

*Phillip Morris USA Inc. v. Shalabi*, 352 F.Supp. 2d 1067, 1075 (C.D. Cal. 2004)……..21

*Rebelution, LLC v.* Perez, 732 F. Supp. 2d 883 (N.D. Cal. 2010)...............................18

*Robi v. Five Platters, Inc.,* 918 F. 2d 1439, 1444 (9th Cir. 1990) .................................12

*Robi v. Reed,* 173 F.3d 736, 740 (9th Cir.1999) …………………………………....11

*Rosso and Mastracco, Inc. v. Giant Food Inc.,* 720 F.2d 1263, 1266, 219 U.S.P.Q.1050 (Fed. Cir. 1983) ..........................................................................12

*Skippy, Inc. v. CPC Int'l, Inc.* , 674 F.2d 209, 216 (4th Cir. 1982) ...............................12

*STX Inc. v. Trik Stik. Inc.,* 708 F. Supp. 1551, 1560 (N.D. Cal. 1988)..............................20

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ............................................10

*Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 616 (9th Cir. 1989).......................15

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). ..........................................................10

*Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) ......................................................................................................14

## STATUTES

15 U.S.C. § 1064(c) ........................................................................................................12

15 U.S.C. § 1116 ........................................................................................................9

15 U.S.C. § 1127 ........................................................................................................22

15 U.S.C. § 1125(a) [Section 43(a)] ..........................................................................13

## TREATISES

Gilson, *Trademark Protection and Practice* § 8.07(1)..............................................20

*McCarthy on Trademarks and Unfair Competition* (2013)...................9, 10, 17, 18, 21

## I. INTRODUCTION

This case involves a famous punk rock band and its iconic logo. Plaintiff Gregory R. Ginn ("Ginn"), a founding and sole continuous member of the band BLACK FLAG, seeks to enjoin several former members of BLACK FLAG from engaging in a further course of conduct that is confusing the public and violating the rights of Ginn and his record company, plaintiff SST Records, Inc. ("SST") in the mark and the logo.

Plaintiffs seek this preliminary injunction because defendants have undertaken and on-going series of live performances, using a confusing variation of BLACK FLAG, namely, "FLAG," printed in the same font used by BLACK FLAG on all of plaintiffs' past and present flyers and posters and plaintiffs' eighteen (18) album covers, together with either the hugely popular BLACK FLAG Logo, or a close variation of that logo. These performances began in May 2013 and continue on until at least November 2013.

Defendants' conduct is especially egregious as evidenced by the conduct of two of the defendants (one performing with FLAG) who have made knowingly false and fraudulent trademark applications to the United States Patent and Trademark Office (the "PTO") for both BLACK FLAG and the logo. The evidence presented in support of platintiffs' application for a temporary restraining order (filed August 2, 2013) is irrefutable on that point, providing an ample basis for this court to find that not only is it highly likely for plaintiffs to succeed on the merits, but also that the equities of this matter are firmly tipped in plaintiffs' favor. Simply put, the untruths on the trademark applications are so extreme and so obvious, whatever weight such applications would normally receive may be rightly and totally disregarded. This is evidence of bad faith of the highest type.

Based upon the following facts and law, injunctive relief against defendants' further infringing activities should issue immediately, and prevent defendants from further damaging Plaintiffs' marks.

## II. STATEMENT OF FACTS

The musical group Black Flag is one of the first, most influential, and well-known bands of American punk rock.

The band was founded in 1976 by guitarist Ginn and defendant Keith Morris ("Morris"), a vocalist, in Hermosa Beach, California. The band's songs were written primarily by Ginn. The band changed its name to Black Flag in late 1978, and began to perform using that name in January 1979. Ginn Decl. ¶ 5.[1] Morris left the band in late 1979, after less than a year of performing under the name BLACK FLAG, and formed his own band. Ginn Decl. ¶ 6. Over the next six to seven years, various singers, bass players, and drummers came and went. Ginn Decl. ¶ 6. In particular, defendant Gary McDaniel ("McDaniel"), a bass player, joined in 1977 and left in 1983. Defendant Dennis "Dez" Cadena ("Cadena"), who was a singer and guitar player, joined in 1980 and left in 1983. Defendant John William Stevenson ("Stevenson") was the drummer from 1982 to 1985. Defendant Henry Garfield, known professionally as Henry Rollins ("Garfield"), was the fourth singer, and stayed with the band from 1981 to 1986, and has not performed as Black Flag since that time. Ginn Decl. ¶ 6.

Ginn has been the sole continuous member of Black Flag from 1976 to the present. In addition to writing most of the songs, Ginn has been the owner of SST, an independent record company that has released all of the band's recordings since 1979, and continues to do so. Ginn Decl. ¶ 7. There are eighteen (18) commercial Black Flag releases on SST, and the catalogue has sold over 800,000 units since 1991, and many thousands more in the 1980s. None of the defendants have *ever* released a Black Flag phonorecord, and SST has been the *only* entity to release and distribute the band's recordings. Ginn Decl. ¶ 7.

The BLACK FLAG words have always been depicted in the same font, on all 18 album covers as well as all of their promotional flyers and posters. That same font is

[1] All references herein to declarations and exhibits herein refer to the Declarations of Gregory R. Ginn and Jose Barraza, which were filed on August 2, 2013.

being used by Defendants to depict FLAG. Ginn Decl. ¶ 19, Ex. G. In addition to the notoriety of the band's name and recordings, the logo of BLACK FLAG is famous and beloved ("the Logo"). The logo consists of 4 vertical, irregular black bars. Complaint ¶ 16. In 2013, an entire 300-page book, entitled *Barred for Life*, explored the phenomenon of people having the Logo tattooed on their bodies. The subtitle of the book is "How Black Flag's Iconic Logo Became Punk Rock's Secret Handshake." Ginn Decl. ¶ 10. The logo was designed by Ginn's brother, artist Raymond Pettibon. Ginn Decl. ¶ 8. (The word mark BLACK FLAG together with the BLACK FLAG Logo are sometimes referred to herein as "the Marks" or "Plaintiffs' Marks.")

The use of the Logo by SST for some 34 years has become a substantial merchandise business for SST, which is run from a large warehouse in Texas. This business has been conducted by SST, owned and operated by Ginn. Up to this year, and the FLAG tour at issue – when defendants began to sell bootleg t-shirts at FLAG shows -- none of the defendants were ever involved in this merchandise business, and none of them ever sold any BLACK FLAG merchandise. The sole exception is defendant McDaniel, who at one time was a partner in SST, but Ginn purchased his share in 1989. McDaniel voluntarily left the business entirely in 1998. Ginn Decl. ¶ 9.

Two of the defendants have sued Ginn and SST in the past. McDaniel sued in 2007, and claimed that he was a partner in Black Flag and was owed revenues from merchandise sales. The parties settled later that year, in September 2007, and McDaniel agreed that he has no interest in Black Flag or its logo, and agreed to never use either the name or the logo ever again. Ginn Decl. ¶ 12. In 2005, defendant Stevenson sued Ginn and SST in 2006, and never alleged that he had any right to use the Marks. Ginn Decl. ¶ 13.

In 2003, Ginn organized a reunion show with defendant Cadena and a drummer who played with the band from 1979 to 1981, and played three shows in the Los Angeles area. In 2010, Ginn performed with singer Ron Reyes, who played with the band in 1980. Ginn Decl. ¶ 11.

Earlier in 2013 Ginn launched a major, 61-date tour of Black Flag, which is ongoing at the present time. Declaration of Jose Barraza ("Barraza Decl."), ¶ 8. Defendants (except defendant Garfield) also organized a tour, beginning in May 2013, using the name FLAG, and are using either a logo that is close to the BLACK FLAG logo, or the actual logo. Ginn Decl. ¶ 19. They are also selling merchandise on their tour that uses the Marks. Barraza Decl. ¶ 7. They have gained control of the Black Flag page on Facebook.com, and are utilizing it to post information of their activities. Ginn Decl. ¶ 19.

As a result of Defendants' conduct, there are two competing bands playing Black Flag's songs and using the Logo to promote their shows. A simple Google search revealing a high degree of public confusion and an attendant need for explanation regarding which musicians are in which band. Ginn has personally encountered fans who think he will be at a future place where FLAG will be playing. Ginn Decl. ¶¶ 18-22.

In September 2012, defendants Garfield and Morris filed two trademark applications; one for the logo, and one for the BLACK FLAG mark. In both of these applications, Garfield and Morris lied to the PTO in the *entirety* of the applications. Ginn Decl. ¶ 14.

First, they told the PTO that they had been using the marks on audio and video recordings since 1978. This is not true; as noted above, <u>only</u> SST has been releasing, manufacturing, and distributing BLACK FLAG phonorecords since 1979. In a particularly audacious move, Garfield and Morris used *SST's albums covers* to show this feigned continuous use. Ginn Decl. ¶ 15.

Second, they told the PTO that they were using the BLACK FLAG name and the Logo on various clothing items "since at least as early as" 1978. Again, this is simply not true. Garfield and Morris have *never* used the Plaintiffs' Marks on clothing items; <u>only</u> SST has. Again, in an act of outrageous fraud, Garfield and Morris used *a bootlegged SST t-shirt* to show that "they" had been making such products since 1978. Ginn Decl. ¶ 16.

Third, they lied to the PTO and swore under oath that they had been using BLACK FLAG continuously for live performances since 1978. This is not true. Morris quit the band in 1979, and, aside from one unscheduled performance in 2011, has not used the mark in some 34 years. Garfield, as noted above, stopped using the mark in 1986, and has not used it since. Tellingly and just as dishonestly, Garfield and Morris used a flyer from a *1986* show to demonstrate "continuous" use since 1979; Garfield has not performed *since* 1986, and Morris quit in 1979. Ginn Decl. ¶ 17.

Defendant Stephen Patrick O'Reilly, professionally known as Stephen Egerton ("Egerton") is currently performing with FLAG and is also utilizing the marks.

## III. PROCEDURAL HISTORY

Plaintiffs filed this action on August 2, 2013, and, on that same date, filed an application for a temporary restraining order. The court denied that application on August 7, 2013, but also ruled that "This order does not preclude Plaintiffs from filing a motion for a preliminary injunction."

After most of the defendants had been served with process, plaintiffs and counsel for all defendants entered into a stipulation that all defendants would file a responsive pleading no later than September 13, 2013.

## IV. ARGUMENT

### A. Preliminary Injunction Standards

15 U.S.C. § 1116 empowers this court to grant a preliminary injunction in a trademark case "according to the principles of equity and upon such terms as the court may deem reasonable." Injunctive relief is the standard remedy in unfair compeition cases. "It is difficult to imagine an unfair competition case where damages are adequate to remedy the problem of defendant's continued acts." *McCarthy on Trademarks and Unfair Competition* § 30:2 (2013), *quoted with approval in Foxtrap, Inc. v. Foxtrap, Inc.* 671 F.2d 636, 215 U.S.P.Q. 1105 (D.C. Cir. 1982).

A party seeking a preliminary injunction must show: (1) it is likely to succeed on

the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tip in its favor, and (4) an injunction is in the public interest. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877, 91 U.S.P.Q.2d 1245 (9th Cir. 2009), *quoting Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).[2]

> In the Ninth Circuit irreparable injury is presumed from a showing of likelihood of confusion, [and] this presumption conflates the dual requirements of the Ninth Circuit test into a single test of a likelihood of success on the merits, which in turn depends on a showing of a likelihood of confusion. *McCarthy supra* § 30:32.

The Ninth Circuit recently affirmed this test in *Marlyn Nutraceuticals*, *supra*, 571 F.3d at 877:

> In evaluating irreparable harm, the court cited Ninth Circuit law holding that "[i]n a trademark infringement claim, 'irreparable injury may be presumed from a showing of likelihood of success on the merits.'" *El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032, 1038 (9th Cir.2003)(quoting *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 n. 4 (9th Cir. 2000)). Because the court found a likelihood of success on the merits, it reasonably presumed irreparable injury.

In the discussion that follows, Plaintiffs establish that establish a likelihood of confusion exists, a likelihood of their success on the merits, as well as the actual and real threat of irreparable injury to Plaintiffs business goodwill and reputation.

## B. Plaintiffs Are the Undisputed Owners of the BLACK FLAG Marks

Ginn was the founder, composer and leading visionary for BLACK FLAG. SST and Ginn have owned and controlled the BLACK FLAG Marks since the first use in

[2] Plaintiffs may provide broad range of evidence to support an injunction. "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The evidentiary rules are relaxed because courts recognized the difficulties associated with gathering evidence while pressed with the urgency of a preliminary injunction motion. *See Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). As a result, courts "may give even inadmissible evidence some weight, when to do so serves [the] purpose of preventing irreparable harm before trial." *Id*.

1978, including the quality of the performances, recordings and merchandise sold under the marks. Even during intervening years of not performing live, SST and Ginn sold merchandise and phonorecords containing the marks. However, Plaintiffs' use and ownership of the BLACK FLAG Marks has been continuous and valid to this day. *Robi v. Reed,* 173 F.3d 736, 740 (9th Cir.1999) held that as between the widow of departing PLATTERS member Paul Robi, and the sole remaining original member, Herb Reed, Reed was the owner of mark. "Reed is the person who has maintained continuity with the group and has been in a position to control the quality of its services. Reed is the only surviving member of the five singers who originally began with the group in 1953. He founded the group, gave the group its name, managed the group, and is the only member who has continuously performed with the group." In contrast, Paul Robi left the group and never returned.

The Ninth Circuit adopted the established principle that departing members of a musical group do not retain rights to use the group's name when they leave the group. *See, e.g., HEC Enters, Ltd. v. Deep Purple, Inc.,* 213 U.S.P.Q. 991 (C.D. Cal.1980) (former members of a group prohibited from performing under the band's name when members of the original group, with certain replacement members, continued to use the name); *Kingsmen v. K-Tel Int'l, Ltd.,* 557 F. Supp. 178 (S.D.N.Y.1983) (holding, *inter alia,* that the former lead singer of The Kingsmen, who was with the group when it recorded the hit song "Louie Louie," did not have the right to use the name after his departure).

As between Ginn and the individual defendants who now claim ownership of the Marks, Ginn is the person who has maintained continuity with the group and has been in a position to control the quality of its services. Ginn is the only remaining member who originally began with the group. He founded the group, gave the group its name, managed the group, and is the only member who has continuously performed with the group. *Id.* at 740.

Each of the defendants (except O'Reilly, who was never in the group) left the

group, never to return. Specifically, defendant Morris left in late 1979, after performing under the BLACK FLAG name *for less than a year.* Defendant McDaniel not only left in 1983, but after protracted litigation in 2007, *agreed not to use the name or logo.* Defendant Cadena joined in 1980 and left in 1983. Defendant Stevenson joined in 1982 and left in 1985. Defendant Garfield joined in 1981 and has not performed as Black Flag since 1986. Ginn Decl. ¶ 6.

### C. Plaintiffs Are Likely To Succeed On The Merits

#### 1. Plaintiff is Entitled to Cancellation of Morris/Garfield Registration Based upon Fraud on the Trademark Office.

A party may seek cancellation of a registered trademark on the basis of fraud under 15 U.S.C. § 1064(c) by proving a false representation of a material fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and damages proximately resulting from the reliance. *Robi v. Five Platters, Inc.,* 918 F. 2d 1439, 1444 (9th Cir. 1990).

The Ninth Circuit affirmed this Court's cancellation of a registration by the Platters' former manager in a case brought by one of the original members Paul Robi. At issue was the oath filed in a declaration of incontestability by the manager's entity (the same oath signed by Garfield and Morris in their own application) claiming it was the only person or entity entitled to use The Platters name, and that there were no final decision adverse to the declarant's rights. In view of "numerous findings adverse to FPI's ownership interest, the affidavit was, as the district court properly concluded, clearly false."

*See e.g., Rosso and Mastracco, Inc. v. Giant Food Inc.,* 720 F.2d 1263, 1266, 219 U.S.P.Q.1050 (Fed. Cir. 1983)(senior user makes false oath in trademark registration application where he fails to acknowledge conflicting rights of junior user which are clearly established by court decree); *Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d 209, 216 (4th Cir. 1982, *cert. denied*, 459 U.S. 969, (1982) (incontestability

affidavit stating there had been no final decision adverse to affiant's registration rights was false where a final decision against registration had been made 21 years earlier).

The oath is this case is for the initial application, which nonetheless requires the a declaration under penalty of perjury that they are the sole lawful owners, the mark has been in continuous use, and there are no other claimants. In the instant case, Morris and Garfield executed the oath before the U.S. Trademark Office in which they declared, "he/she believes the applicant to be the owner of the trademark/service mark sought to be registered . . . to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce. Ginn Decl. ¶ 14, Exs. D and E.

Morris and Garfield were able to obtain the registered mark for the logo only because they lied to the PTO about using it. Plaintiffs are very likely to succeed on the merits regarding cancellation, and defendants should be enjoined.

**2. <u>Plaintiffs Can Show Willful Infringement and Likelihood of Confusion</u>**

Plaintiffs are likely to succeed on their claim of trademark infringement under Section 43(a), 15 U.S.C. § 1125(a) of the Lanham Act because they have valid, protectable rights in the BLACK FLAG Marks and because Defendants' use of the mark is likely to cause confusion as to the source, sponsorship or affiliation of the parties' directly competitive products and services in the marketplace. *See Applied Info. Sciences Corp. v. eBay, Inc.*, 551 F.3d 966, 969 (9th Cir. 2007).

The Ninth Circuit weighs eight factors in evaluating whether an allegedly infringing mark is likely to cause confusion in the marketplace: (1) strength of the mark; (2) similarity of the marks; (3) proximity of relatedness of the goods; (4) evidence of actual confusion; (5) marketing channels used; (6) types of goods and degree of care likely to be exercised by the consumer; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). The Court is not required to address all of the factors, nor

do Plaintiffs need to prevail on every factor. *See Brookfield Communications v. West Coast Entertainment Corp.*, 174 F.3d 1036, 50 U.S.P.Q. 1545, 1052 n. 15 (9th Cir.1999), (at preliminary injunction stage, plaintiff need only "establish that it is likely to be able to show such a likelihood of confusion"); *Aurora World v. Ty, Inc.*, 719 F. Supp.2d 1115, 1156 (C.D. Cal. 2009)(court need not consider all the *Sleekcraft* factors at the preliminary injunction stage).

An examination of these factors show the law and the equities weigh heavily in Plaintfffs' favor.

a. Plaintiffs Have Valid and Protectable Rights In BLACK FLAG and the BLACK FLAG Logo.

Whether a plaintiff's trademark is valid and protectable depends on the mark's "distinctiveness." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010. Marks are generally classified into one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Id.* When a mark is shown to be "inherently distinctive" (*i.e.,* it is suggestive, arbitrary, or fanciful), it is "automatically entitled to federal protection because [its] intrinsic nature serves to identify a particular source of a product," and there is no need to prove secondary meaning to demonstrate that the mark is valid and protectable. *Id.* at 1113. The validity and distinctiveness of the Marks is not in issue in this proceeding.

The Plaintiffs' Marks are inherently distinctive and therefore are entitled to the strongest scope of protection. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F. 2d 500, 506 (9th Cir. 1991) ("[a] strong mark is inherently distinctive" and thus "will be afforded the widest ambit of protection from infringing uses. is an otherwise descriptive term that was arbitrarily applied to unrelated goods and services. Marks such as APPLE for music and computers, or DIESEL when applied to clothing are good examples of arbitrary marks, which are considered some of the strongest of all. Both the word mark and the Logo have acquired enormous strength in the marketplace among consumers by virtue of their longstanding and widespread use in connection with "series of sound

recordings and video featuring music"; "caps, t-shirts, jackets, hooded sweatshirts, baseball jerseys"; and "live performances by a musical group." "The more likely a mark is remembered and associated in the public mind with the mark's owner, the greater protection is accorded by trademark laws." *GoTo.com*, 202 F.3d at 1207.

Ginn and SST have shown that the Marks are highly distinctive, and readily identifiy a famous rock band and the recordings that have been in the SST catalogue for 34 years; SST is the only record label to have released BLACK FLAG recordings. The "four bars" logo is so universally associated with the band that an entire book was written about the use of the logo as a tattoo by fans of the band. Ginn Decl. ¶ 10, p. 4; Ex. C. Defendants are deliberately seeking to capitalize upon the fame and noteriety of the Marks since without creating an association with and using the Marks, they have nothing to sell to the public. No better example of this exists than the interviews given by several of the Defendants in a recently released film documentary on the fame of the BLACK FLAG Logo.[3]

b. Defendants are Using Plaintiffs' Marks to Promote their FLAG Shows and Have Laid Fraudulent Claim to Ownership of the Marks.

"[T]he greater the similarity between the two marks, the greater the likelihood of confusion." *GoTo.com*, 202 F. 3d at 1206; *see also Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 616 (9th Cir. 1989)(likelihood of confusion determination is "made in light of the total effect of the defendants' product and package on the eye of the ordinary purchaser").

While Morris and Garfield have filed two trademark applications for Plaintiffs' marks claiming exclusive rights of ownership in marks identical to Plaintiffs' Marks, the Defendants (other than Garfield) are using the Logo (or some minor variations of it) in promoting the live tour. Still, Defendants are controlling and using the BLACK FLAG

[3] The documentary is called *The Art of Punk*, and may be found on YouTube at http://www.youtube.com/watch?v=N0u04EqNVjo. In the documentary, defendants Garfield, McDaniel, and Morris relate the origins of the famous logo, and other artwork created by plaintiff Ginn's brother, an artist.

Facebook page to promote their shows and reach hundreds of thousands of fans. Under the present facts, Defendants' use of the mark FLAG for their live shows is a distinction without a difference. In short, FLAG is a colorable imitation of BLACK FLAG. FLAG is being depicted in the same font used by SST for the 18 different BLACK FLAG recordings, and all of the past and present posters and flyers for their shows. Ginn Decl. ¶ 7, Ex. A; ¶ 19, Ex. G.

c. <u>The Goods and Service Are More than Related, They are Identical</u>

Where the goods and services are related, then "the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. Here, both parties are in the business of live performances by a musical group, the recordings are Plaintiffs', and both are sellilng tour merchandise using the Logo. Because the goods and services are of the same type, confusion is likely. *Brookfield*, *supra,* 174 F.3d at 1056.

d. <u>There Is Strong Evidence Of Likely Confusion</u>

Apparently, the five defendants who perform as FLAG made some half-hearted and illusory effort to set up a situation in which the public would think that the band that would be performing at a particular venue was not the real Black Flag, but some sort of reunion band that played the music of Black Flag. This effort has failed. Rather, what the five defendants have done is set up a confusing situation, and a performing entity that unfairly competes with Plaintiff's band. Even had their ruse succeeded, it is illegal under any possible reading of the trademark laws to make use of Plaintiffs' marks to promote those shows.

Ginn has been repeatedly approached at his own BLACK FLAG performances with inquiries about his appearance at shows that are not his but instead are those of other defendants. Ginn Decl. ¶ 19, p. 12.

e. <u>The Parties' Marketing Channels are Identical</u>

Under *Sleekcraft*, convergent marketing channels increase the likelihood of confusion. 599 F.2d at 353. Defendants are clearly seeking to capitalize upon their past and mostly brief past affiliation with Ginn and SST to market their FLAG tour to fans of BLACK FLAG. Reliance upon such outlets such as Facebook are a perfect example of the fact that the intended customers for FLAG performances are BLACK FLAG fans.

f. <u>Defendants Intend to Confuse Consumers</u>

Of the factors to be considered, evidence of bad faith in this case is the most persuasive. Garfield and Morris, with no shame, have lied to the U.S. Trademark Office in a blatant attempt to usurp control of Plaintiffs' marks, *decades* after their last real association with the Plaintiffs. Defendants' adoption of FLAG, nothing more than a colorable imitation of BLACK FLAG, is evidence of intent to trade upon the reputation of the original BLACK FLAG group they left years ago. Whether the defendants truly believe they are entitled to use of FLAG is of no avail on the issue of intent and confusion. An intent to "come as close as the law will allow" is an intent to derive benefit from the other party's reputation and "is therefore probative on the likelihood of confusion issue." *McCarthy on Trademarks and Unfair Competition* § 23:116 (2013); *quoting AmBrit, Inc. v. Kraft, Inc.*, 805 F.2d 974, 1 U.S.P.Q.2d 1161 (11th Cir. 1986), op. superseded by 812 F.2d 1531 (11th Cir. 1986), cert. denied, 481 U.S. 1041, 95 L. Ed. 2d 822, 107 S. Ct. 1983 (1987).

"The purpose of taking advantage of the aura of good will which surrounded" BLACK FLAG is the very opposite of "good faith" adoption by a junior user. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963), *cert. denied*, 374 U.S. 830, 10 L. Ed. 2d 1053, 83 S. Ct. 1870 (1963). The court inferred from the fact that the defendant knew of plaintiff's mark (BLACK & WHITE Scotch whiskey) that defendant *must* have intended to take advantage of the good will and recognition which plaintiff had built up, even though defendant might have done so in a

good faith belief that it was not illegal to use the mark on beer: "The *only possible* purpose could have been to capitalize upon the popularity of the name chosen. This possibility, *they must have* known, would extend to their product because the public would associate the name BLACK & WHITE with something old and reliable and meritorious." *See also McCarthy on Trademarks and Unfair Competition* § 23:115 (2013).[4]

If an alleged infringer adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities." *Rebelution, LLC v.* Perez, 732 F. Supp. 2d 883 (N.D. Cal. 2010); *Pac. Telesis v. Int'l Telesis Comms*., 994 F.2d 1364, 1369 (9th Cir. 1993).

Defendants' use of the BLACK FLAG marks are an obvious attempt to capitalize upon the notareity and fame of the group with which they were once associated.

g. Likelihood of Expansion of Product Lines

This particular factor is not in issue in this case.

**D. Absent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm**

**1. Loss of Control of One's Business Reputation is Irreparable Harm.**

Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted. By showing a likelihood of success in proving a likelihood of confusion, plaintiffs also show that, pending a trial without a preliminary injunction they will probably lose control of their reputation "because this reputation rests upon the quality of defendant's activities as a result of a likelihood of confusion of purchasers. Such a likelihood of damage to reputation is by its nature "irreparable."" *McCarthy supra* § 30:47.

"A trademark owner's loss of the ability to control its marks, thus, creates the

---

[4] It has long been the rule in the Ninth Circuit that where a defendant acts with the intent of confusing consumers, *that fact alone* is sufficient to support a finding of a likelihood of confusion. *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006); *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1149 (9th Cir. 2002) *Brookfield*, 174 F.3d at 1059.

potential for damages to its reputation. Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Cytosport, Inc. v. Vital Pharms., Inc.*, 617 F.Supp.2d 1051, 1080 (E.D. Cal. 2009); *See Maxim Integrated Prods. v. Quintana*, 654 F.Supp.2d 1024, 1035-36 (N.D. Cal. 2009)("[i]n trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill").[5]

Plaintiffs have already suffered a real loss of the ability to control the Black Flag Marks, the quality of the performances being offered to the public as Defendants continue to tour the U.S., based solely upon their former BLACK FLAG association.

**2. Defendants' former assoication with BLACK FLAG is their only calling card to sell tickets to the public.**

Plaintiff Ginn is already in danger of losing control over his business and musical reputation, and without an injunction to prevent further touring (and any other exploitation of the marks) pending a trial in this action, the reputation of BLACK FLAG will be very severely damaged. Ginn is spending considerable time, effort and money providing explanations in the press and media about the Defendants' use of the BLACK FLAG Marks. Ginn is the sole composer of almost all of the well-known Black Flag songs, and he is known as the founder, creator and owner of the group.

With another, competing group touring touting the BLACK FLAG logo and association, plaintiff Ginn is losing business and fans that might otherwise attend his shows. These facts indicate that irreparable harm has already occurred, as money cannot compensate Ginn for such damages, or, at the very least, the amount of damages would be very difficult to calculate. Indeed, Defendants' former association with BLACK FLAG is their only calling card to draw audiences to their shows. Without the BLACK FLAG association, Defendants would be forced to choose a dissimilar

---

[5] *See also Diller v. Barry Driller, Inc.*, 2012 U.S. Dist. LEXIS 133515, at *25-26 (C.D. Cal. Sept, 10, 2012) (trademark infringement "creates a significant risk of irreparable harm to Plaintiff's reputation and goodwill if a customer becomes dissatisfied with Defendant's service, but aims that dissatisfaction toward Plaintiff instead of Defendants").

name, or perform under their own names, as any other honorable start-up business is required to do.

When a party adopts a trademark confusingly similar to a mark owned by another, the prior user's reputation slips out of the prior user 's grasp and into the hands of the infringer. *See Sleekcraft,* 599 F.2d at 353 ("(t]he hallmark of a trademark owner's interest in preventing use of his mark on related goods is the threat such use poses to the reputation of his own goods"). As one California district court held when analyzing the balance of hardships.

> Where there is a substantial probability of confusion because of defendant's use of the same or a confusingly similar trademark, irreparable injury ordinarily follows. Confusion may cause injury to business reputation and loss of sales, and there may be no meaningful, proveable monetary recovery available. . . . Damage to an intangible value such as reputation and goodwill can never be accurately ascertained.

*STX Inc. v. Trik Stik. Inc.,* 708 F. Supp. 1551, 1560 (N.D. Cal. 1988) (*quoting* Gilson, *Trademark Protection and Practice* § 8.07(1)).

Consumers who encounter Plaintiffs' Marks will believe, mistakenly, that Defendants' band is Plaintiffs' band, or that Plaintiffs are somehow authorized, endorsed, sponsored or are otherwise affiliated with Defendants' FLAG, causing irreparable harm to Plaintiffs goodwill and reputation.

The damage to Platintiffs is immediate and continuing. Additional damage will occur in the future if Defendants are allowed to release sound recordings and/or to engage in live performances under the BLACK FLAG name and logo. Two defendants have already secured a federal trademark registration for the Logo, which includes sound recordings. Are Defendants intent on recording and releasing confusing recordings using the Plaintiffs' Marks?

### E. The Balance of Equities Weighs Decidedly In Plaintiffs' Favor

For 34 years, Platiniffs have owned and controlled the BLACK FLAG Marks. Plaintiffs should not be in the position of having to explain or defend their rights in the BLACK FLAG, or to spend time and money explaining Defendants' conduct.

Most important, Plaintiffs are losing customers who are purchasing tickets to the Defendants' shows base upon use of Plaintiffs' Marks. Some purchasers of those tickets do not know that Ginn is not performing and has not approved or endorsed the Defendant's shows.

**F. An Interim Injunction Would Serve The Public Interest**

The fourth factor for determining whether preliminary injunctive relief is appropriate is whether the injunction is in the public interest. In defining the public interest on a preliminary injunction in a trademark case, "it is most often a synonym for the right of the public not to be deceived or confused." Once a likelihood of confusion is shown, it follows that the public interest is damaged if such confusion continues. *McCarthy supra* § 30:52 *quoted with approval in Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 19717 U.S.P.Q.2d 1117 (3d Cir. 1990). *See also Phillip Morris USA Inc. v. Shalabi*, 352 F.Supp. 2d 1067, 1075 (C.D. Cal. 2004

A preliminary injunction will protect consumers by helping them to avoid purchasing FLAG concert tickets or merchandise downloads or paraphernalia in the mistaken belief that they are purchasing either Plaintiffs or Defendants' products or services when they wish to purchase the other's.

The Defendants' tour dates are before the court and more are being added. It is up to this court to prevent a complete usurpation of Plaintiffs' rights, and to protect the consuming public pending the outcome of this litigation. The risk of even greater confusion is great. The relief requested will serve the public interest by preventing consumer from attending shows that are not affiliated with, sponsored, or related to the goods and services sold under Plaintiffs' marks.

**G. The Injunction Sought Will Not constitute an Undue Hardship to Defendants**

The remedy sought for the present is carefully tailored to minimize inconvenience and damage to Defendants. Morris and Garfield deliberately lied to the PTO on their applications, and McDaniel even agreed to never use the marks again. Defendants (other than Garfield) have

deliberately chosen to perform publicly under a name they knew was already taken, and probably deserve whatever fate that may bring. They have, therefore, invested time and effort in this ill-advised choice, and can, and no doubt will, protest that to lose it would be an enormous hardship.

The very definition of a "trademark" is that it exists "to identify and distinguish the [user's] goods ...from those manufactured or sold by others, and to indicate the source of the goods. . . ." "Service mark" is defined similarly. 15 U.S.C. § 1127. The problem with the use of FLAG as Defendants' name is that it does not identify and distinguish Defendants' rock band from Plaintiffs' rock band, and it will cause confusion as to the source of those goods and services rendered by either group. To the extent that minimal potential harm to Defendants is recognized at all, it should be "discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 596 (3d Cir. 2002) (affirming grant of preliminary injunction for false advertising).

**H. SST and Ginn are Prepared to Post a Bond**

Plaintiffs are prepared to post a bond as a condition of obtaining likelihood of success on the merits is high and the balance of hard ships weighs heavily in Plaintiffs' favor. The interim relief sought will do little or no harm to Defendants' plans in that they may continue to perform as they have for many years using *their own names*, and not FLAG, BLACK FLAG or the Logo. Plaintiffs believe this bond should be minimal, as Defendants knowingly took the risk of infringing Plaintiffs' trademark and service mark rights, and should not be heard to complain about being required to modify their infringing conduct to mitigate overwhelmingly likely confusion.

## V. CONCLUSION

For the above stated reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Injunction prohibiting Defendants from rendering live stage performances under the name BLACK FLAG, FLAG or any mark confusingly similar thereto; further that Defendants and each of them be restrained from marketing, advertisign, or selling their services using the mark BLACK FLAG, FLAG, or the BLACK FLAG Logo (or any confusingly similar logo), or from selling any concert or tour merchandise including but not limited to clothing, hats, t-shirts, and/or jewelry pending a trial in this action.

Respectfully submitted,

Dated: September 9, 2013

By: /s/ Cheryl L. Hodgson

Cheryl L. Hodgson
HODGSON LEGAL
100 Wilshire Blvd., Suite 950
Santa Monica, CA 90401
Telephone: (310) 623-3515

Evan S. Cohen
1180 South Beverly Drive, Suite 510
Los Angeles, CA 90035-1157
Telephone: (310) 556-9800

Attorneys for Plaintiffs SST RECORDS, INC. and GREGORY R. GINN